IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| IN RE CERNER CORP. | ) | |
| SECURITIES LITIGATION | ) | Consolidated Civil Action No. 03-0296-CV-DW |
| | ) | |

# ORDER

Pending before the Court is the Defendants' motion to dismiss this securities fraud action pursuant to Federal Rule of Civil Procedure 12(b)(6) (Doc. 35). The Plaintiff filed suggestions in opposition (Doc. 41) and the Defendants filed a reply (Doc. 47). After review of the parties' arguments and applicable case law, the Court GRANTS Defendants' motion and dismisses this action WITH PREJUDICE.

**I.**

The Lead Plaintiff in this action is Phil Crabtree ("Plaintiff") who represents a group of all persons that acquired securities of the Cerner Corporation ("Cerner" or the "Company") between July 17, 2002 and April 2, 2003 (the "Class Period").[1] Cerner "provides software, hardware, services and support that help healthcare professionals save time, money, and lives by speeding diagnosis, reducing medical errors, minimizing variance, and improving revenue tracking." Compl. ¶ 10(a).[2]

The Defendants in this action are Cerner, Neal Patterson ("Patterson"), Paul Black ("Black"), Mark Naughton[3] ("Naughton"), Clifford W. Illig ("Illig"), Earl H. Devanny, III ("Devanny") and Glenn P. Tobin ("Tobin"). During the Class Period, Defendant Patterson served

---

[1] The Plaintiff explains that the "Class Period commences on July 17, 2002 when Cerner announced record earnings and revenues, and initial earnings guidance for the first quarter of 2003." See Doc. 41, Suggs. in Opp., at 2 n. 1.

[2] The complaint at issue here is an amended complaint and was filed on December 1, 2003 (Doc. 31). It shall simply be referred to as the Complaint throughout this Order.

[3] Plaintiff's complaint misspells Mr. Naughton's name as "Naulten." Compl., ¶ 10(d).

as Chairman of Cerner's Board of Directors and as Chief Executive Officer, Black served as Executive Vice-President, Naughton served as Chief Financial Officer, Illig served as Vice-Chairman of the Board of Directors, Devanny served as President and Tobin served as Executive Vice-President and Chief Operating Officer. Id. ¶¶ 10(b)-(g). Throughout this Order Cerner and the Individual Defendants will be collectively referred to as the "Defendants."

Plaintiff contends that certain affirmative statements made by the Defendants during the Class Period were false and/or misleading because of undisclosed adverse business conditions that were materially affecting Cerner's business. On July 17, 2002 Cerner issued a press release over PR Newswire and announced its financial results for the second quarter of fiscal year 2002 which ended June 29, 2002. Id. ¶ 45. The press release proclaimed that it was the "eleventh consecutive quarter in which the company has met or exceeded consensus estimates," and that "demand for our systems remains strong." Id. It further provided initial guidance for 2003, stating that Cerner "was comfortable with analyst earnings per share estimates in the range of $1.75 to $1.80 and revenue estimates in the range of $850 to $870 million." Id.

On October 16, 2002 Cerner issued another press release over PR Newswire announcing its financial results for the third quarter of 2002 that ended on September 28, 2002. Id. ¶ 48. In part, the press release stated that Cerner "was comfortable with analyst earnings per share estimates between $1.78 and $1.82 for 2003, an increase over the previous guidance of $1.75 to $1.80, and revenue estimates between $870 and $880 million, up from a prior range of $850 to $870 million." Id. It further stated that "Cerner continues to widen its leadership position in the health care information technology industry." Id.

On January 23, 2003 Cerner issued a third press release over PR Newswire announcing its financial results for the fourth quarter of 2002 and fiscal year 2002 ending December 31, 2002. Id. ¶ 53. This release stated that Cerner "was comfortable with analyst earnings per share estimates

2

for the first quarter of 2003 of $9.38 and full-year estimates between $1.80 and $1.84, up from previous guidance of $1.78 to $1.82." Id. Following this press release, the Company conducted a conference call with investors and analysts. During this call, Black stated that "[o]ur sales pipeline remains very strong, which is impressive considering the enormous volume of deals we have signed and taken out of that pipeline." Id. ¶ 56. Although Patterson stated that Cerner "thought last year [2002] was probably the peak of competitiveness," Devanny added that "[a]ll aspects of our business are strong." Id.

Plaintiff alleges that the nondisclosure of several adverse business conditions rendered the foregoing affirmative statements materially misleading. Specifically, the Complaint alleges that Defendants wrongfully failed to disclose that (1) Cerner was losing a material amount of sales to competitors; (2) customer demand for Cerner products was declining materially; (3) Cerner lost several deals because it laid off its experienced employees and replaced them with employees "straight out of college;" (4) the Company was focusing on larger business deals at the expense of closing smaller deals; (5) in the second, third and fourth quarters of 2002 Cerner "pulled in" revenue that would logically be delayed until the following quarter; and (6) by January 23, 2003 Cerner knew it would not meet analyst estimates for the First Quarter 2003. See id. ¶ 47(a-d).

Near the end of the Class Period the value of Cerner stock fluctuated greatly. On March 31, April 1 and April 2, 2003, analysts issued strong ratings for Cerner stock. Id. ¶ 59. On April 3, 2003, however, the Company announced that "it expects its first quarter revenue and earnings to be below expectations because of a lower level of new business bookings in the quarter." Id. ¶ 60. Cerner further announced expected bookings for the first quarter of 2003 to be between $145 and $150 million and that earnings would be between $0.13 to $0.15 per share as compared to analysts earnings estimates of $0.38 per share. Patterson stated that this disappointment was caused by a "change in the competitive environment and more challenging economics for health

3

care provider organizations [which] resulted in us losing some deals we expected to win and some deals being pushed out of the quarter." Id. After these revelations, the price of Cerner common stock dropped from $32.09 to as low as $17.44 per share.

Based on historical figures, this shortfall of Cerner stock was unusual. As the Defendants note, for thirteen consecutive quarters Cerner met or exceeded Wall Street analyst expectations. "When it announced it would miss the fourteenth quarter, Cerner's stock price took a hit, and the race to the courthouse began, with three complaints being filed the *very same day* that Cerner announced the shortfall." See Doc. 37, Suggs. in Support, at 1 (emphasis in original). The Plaintiff's complaint alleges that the Defendants violated section 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 as promulgated under section 10(b).

On February 9, 2004 the Defendants filed the pending motion. The gravamen of the motion is that the Plaintiff failed to satisfy the pleading requirements of Fed. R. Civ. P. 9(b) and the more stringent requirements of the Private Securities Litigation Reform Act of 1995 (the "PSLRA"). Accordingly, the Defendants move to dismiss this action under Fed. R. Civ. P. 12(b)(6) because the Complaint fails to state a claim upon which relief may be granted.

## II.

In considering a motion to dismiss under Rule 12(b)(6) a district court is "constrained by a stringent standard." See Parnes v. Gateway 2000, Inc., 122 F.3d 539, 545-46 (8th Cir. 1997). "A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Id. Additionally, factual allegations in the complaint must be construed in the light most favorable to the plaintiff. Kushner v. Beverly Enters., Inc., 317 F.3d 820, 824 (8th Cir. 2003) (citations

4

omitted).[4]

## III.

### A.

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe . . . ." See 15 U.S.C. § 78j. Rule 10b-5, as promulgated under section 10(b), prohibits the making of "any untrue statement of a material fact or to *omit to state a material fact* necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . ." 17 C.F.R. § 240.10b-5(b) (emphasis added). The elements of a section 10(b) action are (1) a false statement or an omission of a material fact; (2) in connection with the purchase or sale of securities; (3) with scienter; (4) upon which the plaintiff justifiably relied; and (5) which proximately caused the plaintiff's injury. See, e.g., In re K-Tel Int'l Sec. Litig., 300 F.3d 881, 888 (8th Cir. 2002); In re BankAmerica Corp. Sec. Litig., 78 F. Supp.2d 976, 989-990 (E.D. Mo. 1999).[5]

---

[4] Generally, when a district court considers matters outside of the pleadings, a motion to dismiss for failure to state a claim will be transformed into a motion for summary judgment. See Parnes, 122 F.3d at 546 n. 9. The Eighth Circuit, however, has repeatedly recognized that in deciding a motion to dismiss a court may consider materials "embraced by the pleadings" and materials that are part of the public record. See In re K-Tel, 300 F.3d at 889; In re Staffmark, Inc. Secs. Litig., 123 F. Supp.2d 1160, 1163 n. 2 (E.D. Ark. 2000).

[5] The Complaint also seeks relief under Section 20(a) of the Exchange Act. That section concerns liability for "controlling persons" and provides that

> [e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

See 15 U.S.C. § 78t(a). To state a claim under Section 20(a), a plaintiff must first adequately plead a predicate violation of the Exchange Act or its rules and regulations. See Greebel v. FTP Software, Inc., 194 F.3d 185, 189 n.

5

**B.**

Federal Rule of Civil Procedure 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Prior to the enactment of the PSLRA, courts stringently applied Rule 9(b) in securities fraud cases as a vehicle to deter frivolous lawsuits. In re Anchor Communications, Inc., 22 F. Supp.2d 999, 1003 (D. Minn. 1998); Colby v. Hologic, Inc., 817 F. Supp. 204 (D. Mass. 1993). In securities litigation, Rule 9(b) serves three purposes:

> First, it deters the use of complaints as a pretext for fishing expeditions of unknown wrongs designed to compel in terrorem settlements. Second, it protects against damage to professional reputations resulting from allegations of moral turpitude. Third, it ensures that a defendant is given sufficient notice of the allegations against him to permit the preparation of an effective defense.

In re Anchor, 22 F. Supp.2d at 1003 (citations omitted); see also Suna v. Bailey Corp., 107 F.3d 64, 73 (1st Cir. 1997) (stating that "[w]e have repeatedly emphasized Rule 9(b)'s heightened pleading requirements because of our concern that plaintiffs will bring baseless strike suits against securities defendants in order to increase settlement amounts or to engage in a fishing expedition for evidence on which to base their claims").

**C.**

Congress sought to ratchet up Rule 9(b)'s pleading requirements by enacting the PSLRA.[6]

---

3 (1st Cir. 1999). Because Plaintiff's Complaint fails to adequately plead a predicate violation of the Exchange Act or its rules, the Court need not address Plaintiff's claim under section 20(a).

[6] The Plaintiff states that "[b]ecause the Section 10(b) claims sound in fraud, the pleading is subject to the standards of both [Fed. R. Civ. P. 9(b)] and the [PSLRA]." See Doc. 41, Suggs. in Opp., at 8. As a matter of law, that assertion is erroneous. The Eighth Circuit has recognized that a securities fraud plaintiff "technically do[es] not need to meet the requirements of both Federal Rule of Civil Procedure 9(b) and the PSLRA, as the PSLRA supercedes reliance on 9(b) in securities fraud cases and embodies the standards of 9(b)." In re Navarre Corp. Secs. Litig., 299 F.3d 735, 742 (8th Cir. 2002).

6

The PSLRA's purpose was to further "deter opportunistic private plaintiffs from filing abusive securities fraud claims, in part, by raising the pleading standards for private securities fraud plaintiffs." In re Staffmark, 123 F. Supp.2d at 1163. By raising the pleading standards, the PSLRA "enable[d] district courts to weed out meritless class actions alleging fraud in the purchase and sale of securities." Dudek v. Prudential Secs., Inc., 295 F.3d 875, 877 (8th Cir. 2002).

For purposes of this Order, the PSLRA heightens the pleading requirements for security fraud cases in at least three ways. First, the PSLRA requires the plaintiff to not only state the time, place, the identity of the speaker, and the content of the alleged misrepresentation, but also to explain why the challenged statement or omission is false or misleading. See 15 U.S.C. 78u-4(b)(1); Southland Secs. Corp. v. Inspire Ins. Solutions Inc., 2004 WL 626721, *4 (5th Cir. March 31, 2004); In re Navarre Corp., 299 F.3d at 742. Second, the PSLRA also requires that the complaint, "with respect to each act or omission alleged" to be false or misleading "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." See id. Third, if a complaint is based on "information and belief," as is the case here, the PSLRA requires the plaintiff to "state with particularity all facts upon which [his] belief is formed." See 15 U.S.C. § 78u-4(b)(1).

If a complaint does not satisfy these mandates, the PSLRA removes all judicial discretion and demands that the action be dismissed. See 15 U.S.C. § 78u-4(b)(3)(A) (providing that the "court shall, on the motion of any defendant, dismiss the complaint if the [pleading] requirements . . . are not met"); Kushner, 317 F.3d at 826 (stating that the PSLRA "requires the court to dismiss if these [pleading] requirements are not met").

Mindful of the foregoing, the Court now turns to whether the Plaintiff's Complaint meets

the PSLRA's stringent pleading requirements.

## IV.

The Complaint argues that during the Class Period the Defendants made several public statements that were false and/or misleading in light of several adverse undisclosed facts. The Defendants contend that the Plaintiff's allegations of undisclosed background circumstances which render the affirmative statements false or misleading are themselves pled with insufficient particularity. As noted above, the PSLRA requires that a plaintiff allege specific facts supporting the claim that the statements or omissions at issue were false or misleading. See In re Boston Tech., Inc. Sec. Litig., 8 F. Supp.2d 43, 57 (D. Mass. 1998). Consequently, a motion to dismiss will generally be rejected if a plaintiff identifies "internal reports, memoranda, or the like, and allege both the contents of those documents and defendants' possession of them at the relevant time." Id.

## A.

The Plaintiff first argues that Cerner was losing a material amount of sales to competitors and that this fact should have been disclosed. See Compl. ¶¶ 32-33. The Complaint alleges that a "former Company Vice President and divisional general manager confirms that during the Class Period, competitors . . . were 'giving [products] away' to customers, causing them to win deals to Cerner's detriment." Id. ¶ 33. The Complaint also cites a former Cerner Manager of Quality Systems who "confirms" that as early as 1998 intense pricing competition caused relatively large project to be lost "due to the Company's refusal to match what it considered ruinously aggressive pricing." Id.

Conspicuously absent from these generalized allegations is the name of a single customer

8

Cerner lost to a competitor. Plaintiff also fails to even approximate the number of customers Cerner lost to its competition or the amount of revenue Cerner lost as a result. In addition, the Complaint draws no comparison between customers lost during the Class Period to the average net loss of customers during a similar length of time. See In re Juniper Networks, Inc. Secs. Litig., 2004 WL 540910, * 3 (N.D. Cal. Mar. 11, 2004) (dismissing complaint in part because plaintiff's claim of increased competition relied on "common knowledge and speculation").

In addition, Plaintiff's allegations contradict one another. As the Defendants aptly note, Cerner's Second, Third and Fourth Quarter 2002 and 2002 fiscal year-end results met or exceeded analyst expectations. See Doc. 37, Suggs. in Support, at 9. Therefore, the allegation that Cerner had lost "relatively large projects" due to "intense pricing competition" since 1998 is at best questionable. Compl. ¶ 33. Finally, before the Class Period begun, Patterson stated that Cerner "expected 2002 to be the peak of competitiveness." It is therefore difficult to comprehend Plaintiff's argument that Cerner failed to disclose that competition would be fierce. For all these reasons, the Court finds that the Complaint fails to state with particularity the allegation that during the Class Period Cerner lost a material amount of customers because of competition.

**B.**

The Complaint next alleges that customer demand for Cerner products was declining materially during the Class Period. Id. ¶¶ 34-35. Plaintiff alleges that a

> former regional marketing manager, a former Vice President, a former regional software sales executive, a former operations team leader and a former product management practice manager, all of whom were employed by Cerner during the Class Period, all confirm the loss of significant business during the Class Period in the Washington, DC, area and in Washington State due to customer dissatisfaction . . . .

Id. ¶ 35.

Again, however, the Plaintiff proffers no facts to support these bald allegations. He does not name one dissatisfied Cerner customer, fails to identify the total number of customers who "delayed authorizing additional work or abandoned Cerner altogether," and fails to even approximate the monetary impact on Cerner's bottom line as a result of the alleged dissatisfaction. See In re Retek Inc. Secs., 2004 WL 741571, *8 (D. Minn. Mar. 30, 2004) (dismissing complaint in part because "aside from pointing to a handful of individual deals that were not going well, plaintiffs provide no specific facts to support its allegation of a downward trend"). Furthermore, the alleged decline in customer demand is belied by the fact that Cerner met or exceeded analyst expectations in three of the four quarters during the Class Period. See Doc. 37, Suggs. in Support, at 11.

Nevertheless, and for purposes of argument, the Court will assume Plaintiff pleaded with particularity the allegation that Cerner lost "significant business" during the Class Period in the State of Washington and in Washington D.C. The Complaint, however, does not adequately demonstrate that a loss of business in those two isolated areas reflects a systemic business condition that materially affected Cerner's business on a *national* scale. Accordingly, and for all these reasons, the Court finds that the Complaint fails to plead with particularity the allegation that customer demand for Cerner products was materially declining during the Class Period.

## C.

Prior to the Class Period, Cerner experienced several consecutive quarters of revenue and earnings growth. Compl. ¶ 36. Accordingly to the Complaint, this growth led to increased expectations among investors and analysts. These expectations allegedly put pressure on Cerner to set each quarter's goal higher than the one before. Id. Consequently, Cerner "pull[ed] in revenue that would logically be delayed until the following quarter." Id. The Plaintiff also asserts that a

10

"select group of ten [Cerner] Vice Presidents" offered customers deep discounts during the final negotiation process, "often at the end of the respective quarter so as to recognize revenue immediately instead of in the following quarter." Id. This undisclosed practice allegedly "caused the Company to mortgage future revenues and earnings in order to meet analyst and Company estimates in the 2Q02, 3Q02 and 4Q02." Id.

Under the PSLRA these are bare-bone allegations that must be rejected. The Complaint fails to name one deal that was prematurely pulled-in, much less state the monetary amount or business effect of any such deal. It is similarly silent on the total number of deals that were pulled-in and the approximate amount of the so-called "deep discounts," whether in terms of a percentage or dollar discount. As a result, the Complaint fails to plead with particularity facts demonstrating that Cerner "pulled-in" deals that should have been delayed until the following quarter. Even assuming that it did, however, the Complaint fails to establish that Cerner's alleged practice of "pulling in" deals materially affected Cerner's stock during the Class Period.

In a similar vein, the Complaint cites a former Cerner operations team leader who claims he was directed to "download software to a customer's information technologies system near the end of a quarter, even though he would not thereafter work on that software for as long as six weeks, in order to recognize revenue in the current quarter." Id. ¶ 37. Once again, this allegation fails to name a single customer or specific transaction where such premature downloading occurred, fails to state the frequency of this practice, and fails to explain the monetary effect of such early downloading. Even assuming that premature downloading occurred, the Complaint fails to demonstrate that it had a material impact on Cerner's bottom line.

Finally, the Complaint also alleges that Cerner's revenue recognition policy was more aggressive than its competitors. "Cerner recognized revenue on 25% of the total value of a deal at

11

inception, as opposed to the 20% recognition generally applicable in the market." Id. ¶ 38. The Plaintiff, however, acknowledges that this recognition policy was disclosed by Cerner and known to analysts. Id. Therefore, it cannot be argued that this recognition policy should have been, but was not, disclosed to investors.

**D.**

The Complaint next alleges a "mass layoff" of "approximately 400-500 [Cerner] employees." Id. ¶ 40. The employees laid off were allegedly "among the Company's more experienced, and they were usually replaced by employees 'straight out of college' so as to save costs." Id. This "failure to have experienced sales people caused Defendants to neglect smaller deals in order to focus on a much larger contract with Kaiser Permanente . . . ." Id.

Several former Cerner employees are cited to support these allegations. A former Cerner product management practice manager stated that in late November 2002 he was informed that the Company "intended to lay off a large number of 'higher-salaried' employees beginning around the new year." Id. A former Cerner software sales executive stated that the entire Registration Software Applications sales department was laid off in December 2002. Id.

The Plaintiff's assertion that these allegedly adverse conditions materially affected Cerner stock is little more than rank speculation. First of all, nothing supports Plaintiff's assertion that the termination of 400-500 employees constitutes a *massive* layoff. For example, if a company employees a million employees, the termination of 500 employees would be a relatively minor layoff. Second, even assuming that Cerner intended to lay off a "large number of 'higher salaried' employees" and did lay off an entire sales department, it does not necessarily follow that the terminated employees were experienced or skilled in closing "smaller" deals. Indeed, it takes a

12

certain amount of imagination to find a cause and effect relationship between a lack of experienced workers and a fixation on larger deals. The Court agrees with the Defendants in that "[t]he minimal facts alleged do not . . . support Plaintiff's conclusion that there were 400-500 employees laid off or that they were experienced, high-salaried, or even in sales." See Doc. 37, Suggs. in Support, at 13.

## E.

The Complaint next alleges that "[a]s the Class Period progressed, Cerner's focus shifted to larger deals, especially an ongoing attempt to land a large contract with Kaiser Permanente, at the expense of closing more numerous, but smaller deals." Compl. ¶ 41. "This was, in part, a function of the ongoing reduction in both numbers and experience of the sales force during the Class Period." Id. "Defendants had gambled that by winning the Kaiser Permanente deal, they could conceal their practice of raiding future projected sales to meet analyst estimates for the 3Q02 and 4Q02. Defendants lost." Id. ¶ 42.

Plaintiff, however, fails to identify even one smaller deal that was lost because of Cerner's alleged fixation on the Kaiser transaction. It is thus not surprising that the Complaint also fails to specify the amount of revenue lost because of Cerner's alleged decision to neglect smaller deals. Moreover, the Complaint fails to explain how Cerner's attention on the Kaiser deal was unusual or different in comparison to transactions of similar magnitude. It does not allege "how many people were assigned to the [Kaiser] deal, when they were assigned, how much time they allegedly devoted to it, what employees were diverted from what other deals, or what other deals were ignored as a result." See Doc. 37, Suggs. in Support, at 14-15. For all these reasons, the Court finds that the Complaint fails to plead with particularity facts that Cerner improperly focused on the Kaiser Permanente deal at the expense of closing smaller, but more numerous transactions.

13

**F.**

The final adverse condition alleged in the Complaint concerns the Defendants' January 23, 2003 statement of comfort with analyst estimates for First Quarter 2003. Compl. ¶ 53. This statement of comfort was released over PR Newswire and announced Cerner's financial results for the fourth quarter 2002 and fiscal year 2002 ending December 31, 2002. According to the Plaintiff, the Defendants' statement that they were "comfortable" with the estimates was misleading because they knew on that date that Cerner could not meet the estimates. The statement reads as follows:

> Cerner indicated it was comfortable with analyst earnings per share estimates for the first quarter of 2003 of $9.38 and full-year estimates between $1.80 and $1.84, up from previous guidance of $1.78 to $1.82. The Company expects revenue in 2003 to be between $880 and $900 million, up from a prior range of $870 to $880 million. Cerner expects revenue in the first quarter to be between $205 and $210 million. The Company expects bookings revenue in the first quarter to be around $200 million.[7]

Other allegations embedded in the Complaint, however, demonstrate that this allegation is without merit. The Plaintiff alleges that the Kaiser deal was valued at approximately $500 million. Id. ¶ 40. Plaintiff further alleges that Cerner lost the Kaiser deal in early February 2003. Id. ¶ 42. If Cerner had secured that transaction, however, it would have exceeded the bookings revenue projected for the First Quarter. See Doc. 37, Suggs. in Support, at 19. Because the Kaiser deal was not lost until February, it cannot be said that "as of the January 23, 2003 statement, Defendants and Cerner's sales force were already fully aware that the Company would in fact not meet earnings or revenue targets." Id. ¶ 57(f). The Plaintiff's contradictory allegations concerning the Defendants' January 23, 2003 statement must therefore be disregarded.

---

[7] The foregoing estimates and results were repeated by Cerner in its Form 10-K for the fiscal year 2002, and filed with the SEC on or about March 12, 2003. Compl. ¶ 54.

# V.

After reviewing the Plaintiff's Complaint, the parties' arguments and applicable law, the Court finds that the allegations, whether considered in isolation or in combination with one another, fall far short of satisfying the PSLRA's stringent pleading standards.[8] Although "it is unfortunate that the Plaintiff[] in this case lost money in [his] investments, [his] misfortune does not create a viable cause of action." Parnes, 122 F.3d at 551. The above-captioned case must be dismissed.

In addition, "the purpose of the [PSLRA] is to prevent harassing strike suits filed the moment a company's stock price falls.[9] The [PSLRA] could not achieve this purpose if plaintiffs were allowed to amend and amend until they got it right . . . ." In re Champion Enters., Inc., Sec. Litig., 145 F. Supp.2d 871, 873 (E.D. Mich. 2001). Here, the Plaintiff had nearly eight months to investigate his claims before filing the Amended Complaint. See Doc. 31, Amend. Compl. Despite this generous window, his pleadings are deficient as a matter of law. Moreover, the Plaintiff does not specifically state how these deficiencies would be cured by repleading. Instead, Plaintiff generally states that he is "prepared" to plead with more particularity. See Doc. 41, Suggs. in Opp., at 60; see also In re Capstead Mortgage Corp. Secs. Litig., 2003 WL 22221320, *3 (N.D. Tex. Sept. 19, 2003) (denying motion to amend in part because plaintiffs did not "inform the court of the substance of any proposed amendment"). Under these facts, the Court finds that amendment would be futile and dismisses this action with prejudice. See, e.g., In re K-Tel, 300 F.3d at 899 (affirming denial of leave to amend where plaintiff failed to plead facts with particularity despite

---

[8] Because the Court finds that the Complaint fails to pled with particularity facts establishing that the alleged adverse business conditions existed, it need not reach the Defendants' additional arguments in support of their motion to dismiss.

[9] As noted earlier, three complaints were filed against Cerner the very same day it announced a drop in the value of Cerner stock.

15

having nine months between filing of original and amended complaint). For all these reasons, it is hereby

    ORDERED that the Defendants' motion to dismiss this action (Doc. 35) is GRANTED; it is further

    ORDERED that this action is DISMISSED WITH PREJUDICE. The clerk of court shall mark this case as closed.

    SO ORDERED.

/s/ DEAN WHIPPLE<br>
Dean Whipple<br>
United States District Judge

Date: June 16, 2004